## James Crane *v.* Henry W. Allen.

Witnesses cannot be impeached by proof of particular facts but only by proof of their general reputation for truth and veracity in the neighborhood where they are known, otherwise a witness might be prejudiced without the possibility of defending himself.

Though recognizing the decisions of common law courts, that where a father sends home slaves with his married daughter, it is presumed to be a gift—yet it is settled in Mississippi, that the character of the wife's possession of such property may be shown by her acts and declarations, out of the presence of her husband.

Only adverse possession can be the basis of prescription in Mississippi

APPEAL from the Tenth District Court, parish of Tensas, *Farrar*, J.

T. P. *Farrar* and *Reeves & Briscoe* and *Parham & Short*, for plaintiffs. *Stacy & Sparrow* and *J. M. Chilton*, for defendant. *Stockton* for *Douglas*.

MERRICK, C. J. This suit is brought by the plaintiff to recover of the defendant twenty-eight slaves and their natural increase, together with $2,800 per annum, the alleged value of their services.

The principal facts out of which this controversy took its rise occurred in the State of Mississippi, where both plaintiff and defendant resided at the time.

The defendant claims title to the slaves in controversy through the plaintiff, and hence the burden of proof in this case is upon the defendant to establish, by clear evidence, his right to the property in question.

The principal facts in the case are these: In 1845 the defendant married *Saloam Crane*, the daughter of the plaintiff, who resided in Claiborne county, Mississippi. At the time of her marriage she possessed in her own right certain negroes inherited from her deceased brother, *William C. Crane*, an estate in certain other negroes called the Brashear negroes, determinable upon her death without children, and perhaps one other negro girl given her by her father.

*James Crane*, the plaintiff, having a tract of land or plantation in Sunflower county, Mississippi, placed his daughter and her husband upon the same, with certain negroes belonging to himself, which were either on the place at the time or placed there after *Allen* and his wife took charge of it. *Allen* cultivated the place with these negroes and those belonging to his wife for his own account. In 1847, the second year after *Allen* and wife had taken possession of this plantation, called the Greenbriar or Sunflower Plantation, *Mrs. Allen* being dissatisfied in Sunflower county, an arrangement was made by which she and her husband returned to Claiborne county. The Greenbriar Plantation was left in the condition it then was, negroes and stock, except three of his wife's slaves, *Charles*, *Anarcha* and *Little Sara*, and some horses which *Allen* brought away with him.

He removed to a plantation under the control of *James Crane*, which belonged to his children, inherited from *William C. Crane*. *Mrs. Allen's* interest in this plantation, as heir of her brother, was one-fifth. *Crane* had on the

plantation, when *Allen* and wife moved to it, in Nov. 1847, the twenty-eight slaves now in controversy. *Allen* and wife cultivated this plantation for their own use, as they had previously done with the Greenbriar Place, until she died, in January, 1851. The defendant refusing to deliver up the slaves, an action of replevin was instituted in Mississippi by the plaintiff against the defendant. The defendant removed the slaves to the parish of Tensas, in this State. The bond under which the slaves had been released on replevin being defective, that action was dismissed, and the present action was commenced against the defendant in this State.

He alleges in substance that he has title in this manner : That said *Crane* had given his daughter six slaves previous to his removal to Sunflower county ; that at the time of his removal he gave her verbally a tract of land and three more slaves; that with these slaves, his wife's Brashear negroes and those she had inherited from *William C. Crane*, the Greenbriar plantation was cultivated by him; that he and his wife exchanged the Greenbriar Plantation and slaves with the plaintiff for the William C. Crane or Waterman Crane plantation and slaves; that by the laws of Mississippi he inherited the slaves on the death of his wife as next of kin.

He also relies on the statute of limitations of Mississippi limiting the actions of trover detinue and replevin to three years.

The testimony is almost exclusively made up of depositions.

The jury, on a second trial, (the first jury being unable to agree) *found for* the defendant, and the plaintiff appealed.

The record is voluminous, and the testimony somewhat conflicting. We shall not undertake to recapitulate the same, but merely state the conclusions to which we have arrived.

We disregard all that plea of defendant by which the testimony of certain of plaintiff's witnesses is attempted to be impeached by the proof of particular facts against them. The mode of impeaching the credibility of witnesses is well defined: it is by inquiries as to their general reputation for truth and veracity in the neighborhood where they are known, and not in inquiries as to particular facts which might often be extremely prejudicial to a truthful witness without any possibility of his defending himself against them. *Stanton* v. *Parker*, 5 Rob., 109. 1 Greenleaf's Evidence, No. 461.

We find no sufficient evidence in the record to show that the plaintiff made a verbal gift of the Greenbriar Plantation and the negroes claimed to the defendant's wife. In arriving at this conclusion we have not been unmindful of the decisions of the common law courts, that where a father sends slaves home with his married daughter it is presumed to be a gift; but while we recognize this principle of law, we find another equally well settled in Mississippi, which is also available in this case, viz: that the character of the wife's possession of such property may be shown by her acts and declaration out of the presence of her husband. *Muirhead* v. *Muirhead*, 1 Cushman, 97.

We think it results from the testimony :

1st. That *Crane*, who had not been in the habit of giving off property to his children, did not intend to do so in this instance, either to transfer the ownership of the land which was transferable by deed, or the slaves, which might be conveyed by him by parol.

2d. That *Mrs. Allen* did not understand that she had any title to the property except the eight negroes she held in her own right.

In regard to the alleged exchange of the *property* in the two plantations and slaves, we do not think it took place for these reasons:

1st. *Crane* had not been divested of title to the Greenbriar Plantation, and it would have been absurd in him to attempt to acquire title to a plantation which he already owned, by giving in exchange therefor one which already belonged to the person with whom the exchange was made and her co-heirs.

2d. *Allen* was a lawyer, and the property considerable, and there is not the slightest written evidence of such transfer, and moreover we are informed by defendant's counsel, and such is the law, that a married woman cannot alienate even her right to slaves except by deed duly acknowledged.

3d. The acts of *Mrs. Allen* were inconsistent with such exchange of property, and were not so understood either by herself or by *Crane.*

4th. Such exchange is also inconsistent with the declarations and acts of the defendant after the death of his wife, in obtaining a release of the heirs as to the other property claimed by her in her lifetime, and in asserting as a moral right that *Crane* ought to allow him possession of the property until the debts were paid.

The next question presented for our consideration is the statute of limitations. We find that the limitation of the actions of trespass detinue and trover for taking any goods and chattels to three years, and we suppose the action of replevin to have been limited by a previous statute to the same period. As this statute, instead of acting directly upon the right to the property, only applies to the actions named which might be invoked to recover the property, and does not apply to a bill in Chancery, there might perhaps be some question how far the courts of this State ought to regard the statute creating, as it does, a prescription so much shorter than that known to our own laws.

But we will assume for the purpose of this case, although the point is at least doubtful, that property protected by it from actions of law in that State will be protected when brought to Louisiana, and test the case on this supposition.

We gather from the decisions of the courts of Mississippi that the law in regard to the limitation of actions is governed by rules almost identical with our own laws. Among other things, in order to claim the benefit of this statute, the party must possess as owner. In other words, the possession must be adverse. Now we think this was not the character of *Mrs. Allen's* possession up to the time of her death; she was one-fifth owner of the plantation; she had three negroes upon the place the title to which in her was admitted; her husband had five negroes upon the same place. We think it sufficiently appears, from her declarations and her acts, that she did not possess as owner but merely by the permission and as tenant at will of her father. The possession by *Allen* since his acknowledgement to *Bertron* can give rise to no prescription. In this connection it is proper to remark that the testimony in this case will appear less conflicting when we consider that the act of *Crane* in permitting his son-in-law to remove from one of his plantations to another under his control, and stocked with his hands, could hardly be spoken of by the family or neighbors without calling it an exchange of places. Probably *Crane* himself may have used the same expression, which has been misinterpreted by some of the witnesses.

There is no force in the objection made by defendant, that *Crane* ought to have tendered to the plaintiff the negroes in his possession previous to bringing this action. If *Mrs. Allen* was merely his tenant, the property in the slaves

was not divested, and he could vindicate his ownership of the slaves against any one attempting to deprive him of them. We will, however, in the decree which we shall pronounce, guard the defendant's interest in this respect.

We do not think it just to award damages to the plaintiff without first giving the defendant an opportunity to compel the plaintiff to account for the hire of those slaves, belonging to the defendant, in his possession.

In conclusion, we remark, as we have often done, that it is with diffidence that we undertake to make an application of the law of our sister State on the subject of title to slaves. But as the parties, instead of leaving these matters to the courts of Mississippi for decision, which would have been so much more satisfactory, have sought the interposition of our own courts, we are obliged to decide the case in accordance with such reasons as seem to preponderate.

It is, therefore, ordered, adjudged and decreed by the court, that the judgment of the lower court be avoided and reversed, and now proceeding to pronounce such judgment as ought to have been rendered, it is ordered, adjudged and decreed by the court, that the plaintiff do recover and have judgment in his favor, and against the defendant for the following named slaves described in his petition, viz: *Jack, Tom, Will, Bill, George, Lewis, Jenny, Elizabeth, America, Patsey, Emma, Ed, Hannah, Henry, Sarah, Branch, Narcissa, Ed, Martha, Anderson, Nancy, Ruth* and her child *Noah, Ann, Barbara, Watt, John* and *Henry*, and their increase, if any, born since the pendency of this suit; and it is further ordered, that no writ of possession issue until the plaintiff deposit with the Clerk of the lower court his written release, under seal, in favor of the defendant, of all interest and claim to the girl *Ann* and her children, bequeathed to said *Saloam Allen* by *Waterman Crane*, also all interest and claim in and to slaves *Joe, Isaac, Anarcha, Charles* and *Little Sarah*, and any increase since they have been in the possession of the plaintiff, with a special warranty against his own acts, as affecting the title to said slaves since November, 1847; and it is further ordered, that this cause be remanded to the lower court for the sole purpose of assessing the value of the hire of said slaves herein decreed the plaintiff, with leave to the defendant to plead by way of reconvention or compensation any claim he may have against the plaintiff for the value of the services of his slaves whilst in the possession of the plaintiff; and it is further ordered, that the defendant pay the cost of the appeal and the costs to this date in the lower court, any future cost which may accrue to abide the event of the further litigation in this case.